# IN THE SUPREME COURT OF IOWA

No. 13–0412

Filed February 28, 2014

**RENT-A-CENTER, INC.,**

    Appellee,

vs.

**IOWA CIVIL RIGHTS COMMISSION,**

    Appellant.

_____

Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

The Iowa Civil Rights Commission appeals the district court's order remanding for dismissal its enforcement action against an employer. **REVERSED AND REMANDED WITH INSTRUCTIONS.**

Thomas J. Miller, Attorney General, and Katie A. Hlavka Fiala, Assistant Attorney General, for appellant.

Edward F. Berbarie and Robert F. Friedman of Littler Mendelson, P.C., Dallas, Texas, Mary L. Harokopus and Andrew M. Trusevich, Plano, Texas, Frank B. Harty and Debra L. Hulett of Nyemaster Goode P.C., Des Moines, for appellee.

Russell E. Lovell II, Des Moines, and David S. Walker, Windsor Heights, for amicus curiae National Association for the Advancement of Colored People.

**MANSFIELD, Justice**.

In this case, we must decide whether the Iowa Civil Rights Commission (ICRC) can pursue an enforcement action under the Iowa Civil Rights Act against an employer when the complaining employee signed an agreement with the employer to arbitrate all employment-related claims. The ICRC accepted the administrative law judge's finding that the agreement did not limit the ICRC's rights because the ICRC was not a party to the agreement. On judicial review, the district court disagreed. It found the Federal Arbitration Act (FAA) preempted state law and remanded the matter to the ICRC with instructions to dismiss the matter pending arbitration by the parties. The ICRC appealed.

Because the ICRC was not a party to the agreement and its interest is not derivative of the employee's, we find the agreement does not limit its ability to bring claims against the employer. Iowa law authorizing ICRC enforcement is thus not preempted by the FAA. Accordingly, we reverse the district court's order and remand the case with instructions to affirm the commission's order.

## I. Facts and Procedural History.

Nicole Henry began working for Rent-A-Center, Inc. (RAC) in Council Bluffs in approximately April 2007. On June 19, 2007, as a condition of her continued employment, Henry signed a Mutual Agreement to Arbitrate Claims (Arbitration Agreement) with RAC. The Arbitration Agreement stated that Henry agreed to arbitrate "all claims for violation of any federal, state or other governmental law, statute, regulation or ordinance" arising out of or related to her employment with RAC that "would have been justiciable under applicable state or federal law." It further stated that neither party would

initiate or prosecute any lawsuit or adjudicative administrative action (other than an administrative charge of discrimination to the Equal Employment Opportunity Commission or an administrative charge within the jurisdiction of the National Labor Relations Board) in any way arising out of or related to any claim covered by [the] Agreement.

The Arbitration Agreement also said that nothing in it would "be construed to relieve any party of the duty to exhaust administrative remedies by filing a charge or complaint with an administrative agency and obtaining a right to sue notice, where otherwise required by law."

After her employment began, Henry became pregnant. On November 15, Henry provided RAC with a note from her doctor that imposed a twenty-pound lifting restriction on her for the duration of her pregnancy. Henry alleges the district manager told her "the company usually does not accommodate restrictions or limitations caused by non-work related temporary health conditions, and that [she] should go apply for unemployment immediately." The next day, according to Henry, she "was sent home because the corporate office made the final decision not to accommodate [her], yet the company has been accommodating a pregnant store manager." As an assistant manager, Henry contends she had performed many duties on a daily basis that did not require heavy lifting.

Henry alleges that after she was sent home, the company gave her a choice between unpaid leave and termination. She chose unpaid leave. On February 4, 2008, Henry filed a complaint with the ICRC, alleging RAC had discriminated against her because of her pregnancy. The ICRC cross-filed Henry's complaint with the Federal Equal Employment Opportunity Commission (EEOC) under a workshare agreement between the EEOC and the ICRC.

After attempts to resolve the complaint were unsuccessful, the ICRC filed a statement of charges with the Iowa Department of Inspections and Appeals (DIA) on December 17, 2010. The statement charged RAC with violations of Iowa Code sections 216.6(1) and 216.6(2)(*d*) "based upon its requiring Nicole Henry to take a leave of absence from her employment upon her presenting a doctor's note that she had a pregnancy-related disability." *See* Iowa Code § 216.6(1), (2)(*d*) (2007). Henry's complaint to the ICRC was attached to and expressly incorporated in the statement of charges. In the caption on the statement, Henry's name appeared as the complainant above that of the ICRC.

Once the statement of charges was filed, Henry could no longer obtain a release from the ICRC to commence her own action against RAC in district court. *See* Iowa Code § 216.16(3)(*a*)(3) (2011) (stating the ICRC shall not issue a release for the right to commence an action after notice of hearing has been served on a respondent). Henry did not attempt to intervene in the administrative proceeding against RAC. *See* Iowa Admin. Code r. 161—4.26(1) (allowing an individual to file a motion to intervene in a contested case).

On February 8, 2011, RAC filed a motion to dismiss the ICRC's charges, or in the alternative, compel arbitration. Attached to the motion was an authenticated copy of the Arbitration Agreement.

The DIA's administrative law judge (ALJ) issued a decision on April 19, denying RAC's motion to dismiss or compel arbitration on the ground that the ICRC was not a party to the Arbitration Agreement and therefore not bound by it.

RAC appealed the ALJ's order to the ICRC on April 25 and requested a stay of proceedings. On August 31, however, the ICRC

upheld the ALJ's decision. It reasoned: (1) the ICRC was not a party to the Arbitration Agreement, (2) the ICRC could lawfully initiate proceedings on behalf of persons in Iowa when it believed discrimination had occurred, (3) the remedial actions available to the ICRC are not available to the arbitrator and are important to protect RAC's Iowa workers from discriminatory practices, (4) an arbitrator does not have the same public interest to end discrimination that the ICRC has, and (5) Henry could not waive the enforcement rights statutorily vested in the ICRC.

On September 30, RAC filed a petition in district court for judicial review of the ICRC's order. *See* Iowa Code § 17A.19 (providing for judicial review of agency action). RAC's petition alleged that the Arbitration Agreement and the FAA required that the ICRC's charges be adjudicated by an arbitrator. *See* 9 U.S.C. §§ 1–16 (2012).

After hearing oral arguments from the parties, the district court issued a ruling on March 5, 2013, granting RAC's requested relief. The court found the FAA preempted state law granting jurisdiction to the ICRC over Henry's complaint. In the decision, the court acknowledged a prior United States Supreme Court decision which held the FAA did not bar the EEOC from seeking victim-specific relief in an administrative proceeding for the benefit of a complainant who had signed an arbitration agreement with his employer. *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 122 S. Ct. 754, 151 L. Ed. 2d 755 (2002). Yet the district court found that decision did not apply to a state agency such as the ICRC. The district court therefore remanded the matter to the ICRC with instructions to dismiss the proceeding until Henry and RAC had arbitrated their dispute.

The ICRC appealed. We retained the case.

## II.  Standard of Review.

This case involves questions of legal interpretation.  If an agency has not been clearly vested with discretion to interpret a law, we do not give deference to the agency's interpretation and will substitute our own judgment if we conclude the agency made an error of law.  *See* Iowa Code § 17A.19(10)(*c*); *Renda v. Iowa Civil Rights Comm'n,* 784 N.W.2d 8, 14–15 (Iowa 2010).

The ICRC concedes neither it nor the DIA have been clearly vested with the authority to interpret the relevant provisions of the Iowa Civil Rights Act or federal law, such as the FAA.  Therefore, we shall give no deference to the ICRC's or the DIA's legal interpretations in this case.

## III.  Analysis.

The present controversy involves whether the FAA and the Arbitration Agreement bar the ICRC from bringing nonarbitration claims against RAC relating to Henry's employment.  RAC argues, and the district court agreed, that the ICRC could not assert claims outside arbitration that Henry had agreed to arbitrate.  RAC contends the terms of the FAA-protected Arbitration Agreement would be nullified if the ICRC and the DIA could adjudicate these claims, rather than having them decided by an arbitrator.  In RAC's view, the FAA preempts any state law that would grant authority for the ICRC to bring nonarbitration claims against RAC that relate to matters covered by the Henry–RAC Arbitration Agreement.

The ICRC, on the other hand, denies that it is bringing an action on behalf of Henry.  Rather, it maintains it has brought an independent public enforcement action.  Because it was not a party to the Arbitration Agreement, the ICRC insists it cannot be bound to arbitrate claims against RAC.

We turn first to the ICRC's function and its claims against RAC.

**A. The ICRC.** The ICRC is entrusted by the legislature with interpreting, administering, and enforcing the Iowa Civil Rights Act, which was designed " 'to eliminate unfair and discriminatory practices in public accommodations (and) employment.' " *Estabrook v. Iowa Civil Rights Comm'n,* 283 N.W.2d 306, 308 (Iowa 1979) (quoting 1965 Iowa Acts ch. 121 (preface)); *see also* Iowa Code § 216.5 (outlining the powers and duties of the ICRC). The Act is intended to "correct a broad pattern of behavior rather than merely affording a procedure to settle a specific dispute." *Renda,* 784 N.W.2d at 19 (internal quotation marks omitted).

Among the powers and duties of the ICRC set forth in Iowa Code section 216.5 are the following:

> 2. To receive, investigate, mediate, and finally determine the merits of complaints alleging unfair or discriminatory practices.
>
> . . . .
>
> 5. To hold hearings upon any complaint made against . . . an employer, . . . to subpoena witnesses and compel their attendance at such hearings, to administer oaths and take the testimony of any person under oath, and to compel such . . . employer . . . to produce for examination any books and papers relating to any matter involved in such complaint.

Iowa Code § 216.5(2), (5).

A complaint of discrimination or unfair practice may be filed with ICRC by any aggrieved person. *Id.* § 216.15(1). Alternatively, the ICRC itself, a commissioner of the ICRC, or the attorney general may initiate a complaint. *Id.* When a complaint is filed, the ICRC staff completes an investigation and submits a recommendation to an ALJ, who then makes a determination whether there is probable cause to believe a discriminatory practice has occurred. *Id.* § 216.15(3)(*a*). If the ALJ

concurs that probable cause exists, the ICRC "shall promptly endeavor to eliminate the discriminatory or unfair practice by conference, conciliation, and persuasion." *Id.* § 216.15(3)(*c*).

If the ICRC is unsuccessful in its attempts to resolve the complaint, the ICRC director, with the approval of a commissioner, may issue a notice of charges and require the respondent to answer those charges at an administrative hearing. *Id.* § 216.15(6). "The case in support of such complaint shall be presented at the hearing by one of the commission's attorneys or agents." *Id.* § 216.15(7). The Iowa Attorney General's criminal justice bureau prosecutes the charges on behalf of the ICRC. Iowa Admin. Code r. 61—1.3(3)(e) ("The civil rights unit is a separate unit within the criminal justice bureau. . . . It furnishes legal advice to the civil rights commission and its staff, prosecutes civil rights cases, and represents the commission in cases in which it is a party or is interested.").

We have noted that the "legislative intent was to permit the commission to be selective in the cases singled out to process through the agency, so as to better impact unfair or discriminatory practices with highly visible and meritorious cases." *Estabrook*, 283 N.W.2d at 311. The ICRC, not the complainant, decides whether and how far to pursue an administrative action. *See* Iowa Admin. Code r. 161—3.8(3) (stating a complainant may withdraw a complaint, but that does not prevent the ICRC "from continuing the investigation and initiating a complaint on its own behalf against the original respondent, as provided for in the Act, whenever it deems it in the public interest"); *id.* r. 161—3.12(2)(*c*) (noting the ICRC can close a case "as satisfactorily adjusted when the respondent has made an offer of adjustment acceptable to the executive director or designee but not to the complainant"); *id.* r. 161—4.2(1)(*a*), (*d*)

(indicating the ICRC's attorney prepares the statement of charges and the ICRC can elect not to prosecute some charges despite a probable cause finding).

The Iowa Civil Rights Act authorizes the ICRC to order a respondent found to have engaged in a discriminatory or unfair practice to cease and desist and "to take the necessary remedial action as in the judgment of the commission will carry out the purposes" of the Act. Iowa Code § 216.15(9)(*b*). Such remedies include:

> (1) Hiring, reinstatement or upgrading of employees with or without pay. Interim earned income and unemployment compensation shall operate to reduce the pay otherwise allowable.
>
> . . . .
>
> (5) Extension to all individuals of the full and equal enjoyment of the advantages, facilities, privileges, and services of the respondent denied to the complainant because of the discriminatory or unfair practice.
>
> (6) Reporting as to the manner of compliance.
>
> (7) Posting notices in conspicuous places in the respondent's place of business in form prescribed by the commission and inclusion of notices in advertising material.
>
> (8) Payment to the complainant of damages for an injury caused by the discriminatory or unfair practice which damages shall include but are not limited to actual damages, court costs and reasonable attorney fees.

*Id.* § 216.15(9)(*a*).

A complainant can seek a release—a so-called right-to-sue letter—to pursue his or her own independent action in district court once sixty days have elapsed from the filing of the initial complaint, provided the ALJ has not made a finding of no probable cause. *See id.* § 216.16(1)–(3) (outlining the process for a complainant to obtain a release to pursue relief in district court); *Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d

678, 680 n.1 (Iowa 2013). If the ICRC grants a right-to-sue letter, the agency cannot pursue further action on the complaint. *See* Iowa Code § 216.16(4).

In this case, Henry brought her complaint to the attention of the ICRC on February 4, 2008. She never sought a right-to-sue letter. On December 17, 2010, the ICRC filed its statement of charges against RAC. Those charges incorporated Henry's administrative complaint. Henry did not seek to intervene in the action. *See* Iowa Admin. Code r. 161— 4.26(1) (authorizing intervention in a contested case proceeding).

**B. Overview of the FAA.** Section 2 of the FAA provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The United States Supreme Court has indicated that section 2 of the FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941, 74 L. Ed. 2d 765, 785 (1983). In enacting the FAA, "Congress intended to place arbitration agreements upon the same footing as other contracts, where [they] belong." *Heaberlin Farms, Inc. v. IGF Ins. Co.*, 641 N.W.2d 816, 818–19 (Iowa 2002) (internal quotation marks omitted).

The Supreme Court has repeatedly stated that, under the FAA, parties who have contracted to arbitrate claims arising between them are bound to do so. *See, e.g., Nitro-Lift Techs., L.L.C. v. Howard,* 568 U.S. ___, ___, 133 S. Ct. 500, 503, 184 L. Ed. 2d 328, 332–33 (2012) (per curiam); *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 445– 46, 126 S. Ct. 1204, 1209, 163 L. Ed. 2d 1038, 1044 (2006); *First*

*Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S. Ct. 1920, 1923–24, 131 L. Ed. 2d 985, 993 (1995).

However, the Court has also said that the enforceability of an arbitration agreement flows from the consent of the parties to the agreement. *See, e.g., Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684, 130 S. Ct. 1758, 1775, 176 L. Ed. 2d 605, 624 (2010) ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so."); *Waffle House*, 534 U.S. at 294, 122 S. Ct. at 764, 151 L. Ed. 2d at 769 ("Arbitration under the [FAA] is a matter of consent, not coercion. . . . It goes without saying that a contract cannot bind a nonparty." (Citation and internal quotation marks omitted.)); *First Options*, 514 U.S. at 943, 115 S. Ct. at 1924, 131 L. Ed. 2d at 993 ("[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."); *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474–75, 109 S. Ct. 1248, 1253, 103 L. Ed. 2d 488, 497 (1989) (noting a party cannot be compelled to arbitrate issues if the parties did not require such arbitration in their agreement); *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49, 106 S. Ct. 1415, 1418, 89 L. Ed. 2d 648, 655 (1986) ("[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration.").

We have acknowledged the provisions of the FAA apply in state courts and preempt inconsistent state laws. *Heaberlin Farms*, 641 N.W.2d at 818–19 (stating the FAA preempts state law by operation of the Supremacy Clause where state law is in conflict with the provisions

of the FAA); *see also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109, 121 S. Ct. 1302, 1306, 149 L. Ed. 2d 234, 243 (2001) (holding the FAA covers all employment contracts with arbitration clauses within the reach of Congress's commerce power except for those of transportation workers). Yet, when discussing the FAA and arbitration agreements, we have also noted "arbitration is a matter of contract and parties cannot be compelled to arbitrate a question which they have not agreed to arbitrate." *Bullis v. Bear, Stearns & Co.*, 553 N.W.2d 599, 601–02 (Iowa 1996) (internal quotation marks omitted) (noting the question of whether a nonsignatory to an arbitration agreement could be bound to the agreement was a matter of contract and agency law).

**C. *EEOC v. Waffle House.*** In *Waffle House*, as we have already mentioned, the United States Supreme Court held an arbitration agreement between an employer and an employee did not bar the EEOC from bringing an enforcement action against the employer to obtain relief for the employee. 534 U.S. at 297, 122 S. Ct. at 766, 151 L. Ed. 2d at 771. That case began when an employee was discharged after suffering a seizure at work. *Id.* at 282–83, 122 S. Ct. at 758, 151 L. Ed. 2d at 761–62. He filed a timely charge of disability discrimination with the EEOC, which ultimately brought a civil action asking the court to grant relief to the employee, including backpay, reinstatement, and compensatory damages. *Id.* at 283–84, 122 S. Ct. at 758, 151 L. Ed. 2d at 762.

The employer filed a petition under the FAA to stay the suit and compel arbitration. *Id.* at 284, 122 S. Ct. at 759, 151 L. Ed. 2d at 762. The district court denied the employer's motion. *Id.* On appeal, the United States Court of Appeals for the Fourth Circuit reversed, holding the EEOC was "precluded from seeking victim-specific relief in court

because the policy goals expressed in the FAA required giving some effect to [the employee]'s arbitration agreement." *Id.* The Fourth Circuit distinguished between "victim-specific relief" and "broad injunctive relief," finding that in the former area, the FAA's policies outweighed those of Title VII of the Civil Rights Act of 1964. *Id.* at 290, 122 S. Ct. at 762, 151 L. Ed. 2d at 766.

The Supreme Court reversed the Fourth Circuit. In a key passage, the Court explained,

> Absent some ambiguity in the agreement, however, it is the language of the contract that defines the scope of disputes subject to arbitration. For nothing in the statute authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement. The FAA does not mention enforcement by public agencies; it ensures the enforceability of private agreements to arbitrate, but otherwise does not purport to place any restriction on a nonparty's choice of a judicial forum.

*Id.* at 289, 122 S. Ct. at 762, 151 L. Ed. 2d at 766 (citation omitted).

Later in its opinion, the Court returned to this theme:

> Because the FAA is at bottom a policy guaranteeing the enforcement of private contractual arrangements, we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement. While ambiguities in the language of the agreement should be resolved in favor of arbitration, we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated. Arbitration under the [FAA] is a matter of consent, not coercion. Here there is no ambiguity. No one asserts that the EEOC is a party to the contract, or that it agreed to arbitrate its claims. It goes without saying that a contract cannot bind a nonparty. Accordingly, the proarbitration policy goals of the FAA do not require the agency to relinquish its statutory authority if it has not agreed to do so.

*Id.* at 294, 122 S. Ct. at 764, 151 L. Ed. 2d at 769 (citations and internal quotation marks omitted). In short, the Court did not base its analysis

on clashing federal policies but emphasized, rather, that the EEOC had not been a party to the employee–employer arbitration agreement. The Court went on to add that the EEOC's claim was not "merely derivative" of the employee's claim, nor did the EEOC simply "stand in the employee's shoes" or act as "a proxy" for the employee. *Id.* at 297–98, 122 S. Ct. at 766, 151 L. Ed. 2d at 771.

There are considerable similarities between Title VII and the Iowa Civil Rights Act. Just as the EEOC in *Waffle House* exercised enforcement powers, remedies, and procedures set forth in Title VII to enforce federal prohibitions against discrimination in the workplace, the ICRC has been authorized by the legislature to interpret, administer, and enforce the Iowa Civil Rights Act to eliminate discriminatory and unfair practices in employment in Iowa. *Compare Waffle House*, 534 U.S. at 285, 122 S. Ct. at 759, 151 L. Ed. 2d at 763, *with Estabrook*, 283 N.W.2d at 308. As the Supreme Court put it in *Waffle House*,

> [W]henever the EEOC chooses from among the many charges filed each year to bring an enforcement action in a particular case, the agency may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee, even when it pursues entirely victim-specific relief.

534 U.S. at 296, 122 S. Ct. at 765, 151 L. Ed. 2d at 770. Likewise, the ICRC is "selective in the cases singled out to process through the agency," *Estabrook*, 283 N.W.2d at 311, and, while it may pursue victim-specific relief, it does so to enforce the Iowa Civil Rights Act, which is intended to "correct a broad pattern of behavior rather than merely affording a procedure to settle a specific dispute," *Renda*, 784 N.W.2d at 19 (internal quotation marks omitted).

Additionally, both the federal civil rights laws and the Iowa Civil Rights Act allow victims to bring their own lawsuits if a certain time

period has passed without agency action. *Compare* 42 U.S.C. § 2000e–5(f)(1) (allowing an action to be brought by the complainant after the statutorily prescribed time period if the EEOC dismisses the charges or takes no action), *with* Iowa Code § 216.16(2) (allowing an action for relief to be brought by the complainant after the complaint has been on file for sixty days and the ICRC issues a release). But once either the EEOC or the ICRC initiates proceedings, the agency, not the complainant, is the "master of its own case" and determines the course of the case. *Waffle House*, 534 U.S. at 291, 122 S. Ct. at 763, 151 L. Ed. 2d at 761. *Compare* 42 U.S.C. § 2000e–5(b) (noting the EEOC can file its own charge), 42 U.S.C. § 2000e–(f)(1) (giving the EEOC exclusive rights over a case for 180 days or until a right-to-sue letter has been issued), *and Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 331, 100 S. Ct. 1698, 1706–07, 64 L. Ed. 2d 319, 330 (1980) ("EEOC enforcement actions are not limited to the claims presented by the charging parties. Any violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaint are actionable."), *with* Iowa Code § 216.16(2) (noting the ICRC has control of the claim for sixty days before a complainant can seek the right to sue), Iowa Admin. Code r. 161—3.12(2)(c) ("A complaint may be closed as satisfactorily adjusted when the respondent has made an offer of adjustment acceptable to the executive director or designee but not to the complainant."), *and* Iowa Admin. Code r. 161—4.2(1)(*a*), (*d*) (indicating the ICRC's attorney prepares the statement of charges and can elect not to prosecute some charges even when probable cause has been found). Both the EEOC and the ICRC may decide to pursue a matter even when the original complainant has "disavowed any desire to seek relief." *Waffle House*, 534 U.S. at 291, 122 S. Ct. at 763, 151 L. Ed. 2d at 767. *Compare* 29

C.F.R. § 1626.13 (2013) ("Because the Commission has independent investigative authority, . . . it may continue any investigation and may secure relief for all affected persons notwithstanding a request by a charging party to withdraw a charge." (Citation omitted.)), *with* Iowa Admin. Code r. 161—3.8(3) (authorizing a claimant to withdraw a complaint, but indicating the ICRC can still file its own complaint against the original respondent when it deems it in the public interest).

At the same time, both the federal and the Iowa civil rights laws afford some protection to settlements between employers and employees. In *Waffle House*, the Court noted that if an employee "had accepted a monetary settlement, any recovery by the EEOC would be limited accordingly." 534 U.S. at 296, 122 S. Ct. at 766, 151 L. Ed. 2d at 770. The Court stressed, "[I]t goes without saying that the courts can and should preclude double recovery by an individual." *Id.* at 297, 122 S. Ct. at 766, 151 L. Ed. 2d at 770 (internal quotation marks omitted). Likewise, in *Board of Supervisors v. Iowa Civil Rights Commission*, this court held that a settlement of a civil rights claim through a negotiated salary increase could not be challenged by the ICRC as discriminatory for "some period of time." 584 N.W.2d 252, 257 (Iowa 1998).

Given these similarities, the ICRC urges that *Waffle House* controls here. It should not make a difference, according to the ICRC, that the enforcement action was brought by a state civil rights agency rather than a federal one. As we read the Supreme Court's opinion, we are inclined to agree. The essential point of *Waffle House* is that the FAA's reach does not extend to a public agency that is neither a party to an arbitration agreement nor a stand-in for a party. 534 U.S. at 289, 294, 122 S. Ct. at 762, 764, 151 L. Ed. 2d at 766, 769. True, at one point the Court refers to "the detailed [Title VII] enforcement scheme created by Congress." *Id.*

at 296, 122 S. Ct. at 765, 151 L. Ed. 2d at 770. But this paragraph of the Court's opinion needs to be read in its entirety:

> The compromise solution reached by the Court of Appeals turns what is effectively a forum selection clause into a waiver of a nonparty's statutory remedies. But if the federal policy favoring arbitration trumps the plain language of Title VII and the contract, the EEOC should be barred from pursuing any claim outside the arbitral forum. If not, then the statutory language is clear; the EEOC has the authority to pursue victim-specific relief regardless of the forum that the employer and employee have chosen to resolve their disputes. Rather than attempt to split the difference, we are persuaded that, pursuant to Title VII and the ADA, whenever the EEOC chooses from among the many charges filed each year to bring an enforcement action in a particular case, the agency may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee, even when it pursues entirely victim-specific relief. To hold otherwise would undermine the detailed enforcement scheme created by Congress simply to give greater effect to an agreement between private parties that does not even contemplate the EEOC's statutory function.

*Id.* at 295–96, 122 S. Ct. at 765, 151 L. Ed. 2d at 769–70.

Even here, the Court criticizes the Fourth Circuit for creating "a waiver of a nonparty's statutory remedies" and "giv[ing] greater effect to an agreement between private parties" than the agreement itself would allow. *Id.* Hence, we do not view the Court's reasoning as based upon the notion that Title VII *trumps* the FAA in this area. Rather, the Court relied on *the inherent limitations* of the FAA and the underlying arbitration agreement. That being the case, it should not matter whether a federal or a state civil rights enforcement regime is at issue. Nonparties don't have to arbitrate.

**D. Subsequent United States Supreme Court Decisions.** Still, RAC contends that several later Supreme Court cases have clarified the law and establish that the FAA has preemptive force here.

The first of these cases, *Preston v. Ferrer*, involved a contract dispute between two private parties: an attorney in the entertainment industry, Preston; and his client, Ferrer, a TV personality. 552 U.S. 346, 350, 128 S. Ct. 978, 981–82, 169 L. Ed. 2d 917, 923 (2008). Preston sought fees allegedly due under the parties' contract and invoked the contract's arbitration provision. *Id.* at 350, 128 S. Ct. at 982, 169 L. Ed. 2d at 923. Ferrer countered by filing a petition with the California Labor Commissioner that claimed Preston was acting as an unlicensed talent agent and, therefore, the contract was invalid under the California Talent Agencies Act. *Id.* The California courts determined the labor commission had "exclusive original jurisdiction" over the dispute. *Id.* at 351, 128 S. Ct. at 982, 169 L. Ed. 2d at 924 (internal quotation marks omitted). The Supreme Court granted certiorari "to determine whether the FAA overrides a state law vesting initial adjudicatory authority in an administrative agency." *Id.* at 351–52, 128 S. Ct. at 982–83, 169 L. Ed. 2d at 924.

The Court noted the arbitration agreement provided that " 'any dispute . . . relating to the . . . validity, or legality' of the agreement 'shall be submitted to arbitration.' " *Id.* at 352, 128 S. Ct. at 983, 169 L. Ed. 2d at 924. "[T]he question is simply who decides whether Preston acted as personal manager or as talent agent." *Id.* at 352, 128 S. Ct. at 983, 169 L. Ed. 2d at 925. The Court held that Ferrer could not avoid arbitration on that question. *Id.* at 353–54, 128 S. Ct. at 983–84, 169 L. Ed. 2d at 925–26; *see also Buckeye Check Cashing, Inc.*, 546 U.S. at 446, 126 S. Ct. at 1209, 163 L. Ed. 2d at 1044 (finding questions about the validity of a contract in its entirety are to be decided "by an arbitrator, not a court"); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–404, 87 S. Ct. 1801, 1806, 18 L. Ed. 2d 1270, 1277 (1967)

(indicating the FAA "does not permit the federal court to consider claims of fraud in the inducement of the contract generally").

The Court observed that, in Ferrer's case, the labor commissioner would serve as an impartial arbiter, in contrast to the EEOC's "role of an agency, not as adjudicator but as prosecutor, pursuing an enforcement action in its own name" in *Waffle House*. *Preston*, 552 U.S. at 359, 128 S. Ct. at 987, 169 L. Ed. 2d at 929. It also made clear that "the arbitration clause in [Ferrer's] contract . . . leaves undisturbed the Labor Commissioner's independent authority to enforce the [Talent Agencies Act]. And so it may." *Id.* at 358–59, 128 S. Ct. at 986–87, 169 L. Ed. 2d at 928–29. The Court pointed out that the enforcement of the arbitration agreement as between the parties "does not displace any independent authority the Labor Commissioner may have to investigate and rectify violations of the [Talent Agencies Act]." *Id.* at 359 n.7, 128 S. Ct. at 987 n.7, 169 L. Ed. 2d at 929 n.7.

The Court further noted that "Preston's petition presents precisely and only a question concerning the forum in which the parties' dispute will be heard." *Id.* at 359, 128 S. Ct. at 987, 169 L. Ed. 2d at 929. The Court added:

> [We] disapprove the distinction between judicial and administrative proceedings drawn by Ferrer and adopted by the appeals court. When parties agree to arbitrate all questions arising under a contract, the FAA supersedes state laws lodging primary jurisdiction in another forum, whether judicial or administrative.

*Id.*

According to RAC's interpretation of *Preston*, because RAC and Henry agreed to arbitrate all employment disputes, the FAA preempts state law granting administrative jurisdiction to the ICRC over matters related to Henry's employment with RAC. We do not share this view.

In *Preston,* a private individual sought to rely on state law to avoid having to arbitrate a specific issue he had agreed to arbitrate. *Id.* at 353–54, 128 S. Ct. at 983–84, 169 L. Ed. 2d at 925–26. The California Labor Commissioner would have determined only whether the parties' contract was valid—a question committed to the arbitrator by the contract itself. *Id.* at 352, 359, 128 S. Ct. at 983, 987, 169 L. Ed. 2d at 924, 929. By contrast, here, the ICRC is not only a forum. Rather, like the EEOC in *Waffle House*, it is a public agency acting in its prosecutorial capacity to bring an enforcement action against RAC, independent of Henry's own claims, in order to protect the public interest under the Iowa Civil Rights Act. *Preston* carves out this specific situation and makes clear it is not covered by the Court's holding. *See id.* at 359 n.7, 128 S. Ct. at 987 n.7, 169 L. Ed. 2d at 929 n.7.

RAC also directs us to another case where the litigants were parties to an arbitration agreement. *See AT&T Mobility LLC v. Concepcion,* 563 U.S. \_\_\_, 131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011). The Concepcions had entered a contract for the sale and servicing of cell phones with AT&T which "provided for arbitration of all disputes between the parties, but required that claims be brought in the parties' 'individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.'" *Id.* at \_\_\_, 131 S. Ct. at 1744, 179 L. Ed. 2d at 749. The Concepcions disputed certain charges incurred and filed a complaint against AT&T in federal district court that was later consolidated with a class action. *Id.* at \_\_\_, 131 S. Ct. at 1744, 179 L. Ed. 2d at 749–50. AT&T moved to compel arbitration with the Concepcions, who argued in response that the agreement to arbitrate was "unconscionable and unlawfully exculpatory under California law because it disallowed classwide procedures." *Id.* at \_\_\_, 131 S. Ct. at

1745, 179 L. Ed. 2d at 750. Relying on the California Supreme Court's decision in *Discover Bank v. Superior Court,* 113 P.3d 1100 (Cal. 2005), the district court denied AT&T's motion to compel arbitration because "AT&T had not shown that bilateral arbitration adequately substituted for the deterrent effects of class actions." *Concepcion,* 563 U.S. at ___, 131 S. Ct. at 1745, 179 L. Ed. 2d at 750. The Ninth Circuit agreed and found the FAA did not preempt the *Discover Bank* rule invalidating the arbitration agreement under California law. *Id.*

The United States Supreme Court took a different view. It determined the *Discover Bank* rule stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and was therefore preempted by the FAA. *Id.* at ___, 131 S. Ct. at 1753, 179 L. Ed. 2d at 759 (citation and internal quotation marks omitted). The Court conceded that the rule did not prohibit arbitration outright; it merely invalidated arbitration clauses that did not allow for classwide arbitration. *Id.* at ___, 131 S. Ct. at 1750, 179 L. Ed. 2d at 755. Nonetheless, analogizing the *Discover Bank* rule to a state law requiring arbitration to comply with the Federal Rules of Civil Procedure, which the Concepcions admitted would be unenforceable, the Court found that superimposing classwide procedures on traditional bilateral arbitration would make the process slower and more costly, and entail greater risk. *Id.* at ___, 131 S. Ct. at 1750–52, 179 L. Ed. 2d at 756–58. "It is not reasonably deniable that requiring consumer disputes to be arbitrated on a classwide basis will have a substantial deterrent effect on incentives to arbitrate," the Court said. *Id.* at ___ n.8, 131 S. Ct. at 1752 n.8, 179 L. Ed. 2d at 758 n.8. In short, *Concepcion* indicates that "[s]tates cannot require a procedure that is inconsistent with the FAA,

even if it is desirable for unrelated reasons." *Id.* at ___, 131 S. Ct. at 1753, 179 L. Ed. 2d at 758.

RAC reads *Concepcion* as invalidating state laws that shift particular disputes from consensual bilateral arbitration to another forum. In RAC's view, mandating state civil rights enforcement through administrative and judicial proceedings is analogous to prohibiting arbitration agreements that do not allow classwide arbitration: Both ultimately intrude upon the role of traditional arbitration.

We do not read *Concepcion* so broadly. The problem in *Concepcion* was that the state law operated directly on the parties' arbitration agreement and required something different from the relatively informal process contemplated by the FAA and agreed to by the parties. It interfered with "the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Id.* at ___, 131 S. Ct. at 1748, 179 L. Ed. 2d at 753. Here, by contrast, RAC cannot point to any provision in the Arbitration Agreement that would not be enforced according to its terms. RAC, rather, seeks relief against a nonparty, a situation not addressed by *Concepcion.*

RAC also relies on some recent summary reversals by the United States Supreme Court of state supreme court decisions declining to order arbitration. In *Sonic-Calabasas A, Inc. v. Moreno,* the California Supreme Court had refused to enforce a waiver of a state administrative wage-claim process in an arbitration agreement between an employee and an employer. 247 P.3d 130, 152 (Cal.), *rev'd,* 563 U.S. ___, 132 S. Ct. 496, 181 L. Ed. 2d 343 (2011). Under this process, an employee with a claim for unpaid wages could obtain an informal hearing before the California Labor Commissioner, with the employer having a right of de novo review before the superior court. *Id.* at 133. The California Supreme Court

found that the arbitration agreement could take effect only after the wage claim was initially addressed by the labor commissioner; thus, an appeal would go to arbitration rather than the superior court. *Id.* at 137–38. The United States Supreme Court vacated the judgment and remanded the case "for further consideration in light of *AT&T Mobility LLC v. Concepcion.*" *Moreno*, 563 U.S. at ___, 132 S. Ct. at 496, 181 L. Ed. 2d at 343.

RAC maintains that because the statute in *Moreno* authorized the labor commissioner in some circumstances to prosecute wage claims after receiving them, *see* 247 P.3d at 134, the Supreme Court's remand for further consideration in light of *Concepcion* indicates matters assigned to arbitration by employee–employer arbitration agreements are not subject to administrative enforcement in a different forum. We disagree. The California Supreme Court's decision did not turn on any independent authority of the labor commissioner to prosecute wage claims. Rather, it focused on the fact that the California legislature had established an administrative "gateway" for wage claims and reasoned that the FAA did not bar a state from requiring parties to proceed through that gateway before commencing arbitration between themselves. *Id.* at 151.

In a per curiam opinion, the Supreme Court vacated a West Virginia highest court decision that refused to enforce predispute arbitration agreements in cases alleging personal injury or wrongful death against nursing homes. *See Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. ___, ___, 132 S. Ct. 1201, 1202, 182 L. Ed. 2d 42, 44 (2012) (per curiam), *vacating Brown ex rel. Brown v. Genesis Healthcare Corp.*, 724 S.E.2d 250 (W. Va. 2011). The Supreme Court stated the West Virginia court's "interpretation of the FAA was both incorrect and

inconsistent with clear instruction in the precedents of this Court." *Id.* at ___, 132 S. Ct. at 1203, 182 L. Ed. 2d at 45. The following term, the Supreme Court also vacated an Oklahoma Supreme Court decision that declared noncompetition agreements in two employment contracts null and void, rather than leaving that determination to the arbitrator in the first instance. *See Nitro-Lift Techns.*, 568 U.S. at ___, 133 S. Ct. at 501, 184 L. Ed. 2d at 330–31, *vacating* 273 P.3d 20 (Okla. 2011). The Supreme Court determined the Oklahoma court had disregarded its FAA precedents and, quoting *Preston*, noted it had been established that "when parties commit to arbitrate contractual disputes, it is a mainstay of the Act's substantive law that attacks on the validity of the contract, as distinct from attacks on the validity of the arbitration clause itself, are to be resolved 'by the arbitrator in the first instance, not by a federal or state court.'" *Id.* at ___, 133 S. Ct. at 503, 184 L. Ed. 2d at 332 (quoting *Preston*, 552 U.S. at 349, 128 S. Ct. at 981, 169 L. Ed. 2d at 923).

We see *Marmet* and *Nitro-Lift* as readily distinguishable. Both reflect efforts by states to displace the arbitration forum in an action between the parties to the arbitration agreement. Neither involves, as here, the independent responsibility of a government agency to enforce state civil rights law.

**E. Application of *Waffle House* in Other State Courts.** It is also worth considering the views of other state supreme courts. How have they addressed the authority of state agencies to bring independent enforcement actions on matters that private parties by agreement committed to arbitration? Although the sample size is small, two state supreme courts applying *Waffle House* have found that state agencies retain their independent enforcement authority, even when the

proceeding was initiated by a complaint from an individual who had agreed to arbitrate the dispute.

In *People v. Coventry First LLC*, the New York Court of Appeals reasoned that *Waffle House* stood for two basic propositions: (1) "pro-arbitration policy goals do not require a government agency to give up its statutory enforcement authority in favor of arbitration if it has not consented to do so," and (2) "the government agency may seek relief specific to a victim who agreed to arbitrate claims, because . . . that relief is best understood as part of the vindication of a public interest." *Coventry First*, 915 N.E.2d 616, 619 (N.Y. 2009). There, the state attorney general commenced an action against life insurance settlement providers, alleging fraudulent and anticompetitive conduct and seeking damages " 'on behalf of the owners of life insurance policies who have been damaged by the schemes.' " *Id.* at 618. Coventry First moved to compel arbitration on all claims for victim-specific relief because the life insurance policyholders had agreed in writing to arbitrate any disputes with the providers. *Id.*

In affirming the lower courts' denial of arbitration, the New York court found that the attorney general's authority to protect the public interest was comparable to that of the EEOC in *Waffle House* and held that he could seek injunctive and victim-specific relief against Coventry First. *Id.* at 619. It concluded the agreement of the private parties "cannot alter the Attorney General's statutory role or the remedies that he is empowered to seek." *Id.*

In a case with facts similar to those here, the Massachusetts Supreme Judicial Court found that *Waffle House* applied to a state civil rights agency's enforcement powers. *See Joulé, Inc. v. Simmons*, 944 N.E.2d 143, 149 (Mass. 2011). In *Joulé*, a former employee alleged her

employer had terminated her employment for discriminatory reasons and lodged a complaint with the Massachusetts Commission Against Discrimination (MCAD). *Id.* at 145. The employer responded by filing a court action and a motion to compel arbitration based on the employee's agreement to arbitrate the claim under the arbitration provision contained in her employment agreement. *Id.* The employee resisted the motion to compel arbitration and MCAD intervened. *Id.* at 147. The trial court concluded MCAD had authority to conduct an investigation and adjudication, unaffected by the arbitration agreement. *Id.* It further decided the employee was not precluded from participating in the MCAD matter as a party. *Id.* The employer appealed.

The Supreme Judicial Court of Massachusetts concluded MCAD could "conduct its own, independent proceeding based on [the complainant's] complaint," even if the complainant was bound by a valid arbitration agreement to have her own employment discrimination claims decided by the arbitrator. *Id.* at 145. Relying on *Waffle House*, the court stated "[e]ven where there is a clear and unmistakable provision in an employment agreement requiring arbitration of discrimination claims . . . it would not affect the MCAD's authority . . . [to proceed] with its investigation and resolution of [the complainant's] discrimination complaint—including, if evidence warrants, granting relief specific to [the complainant]." *Id.* at 149. However, the court found the employee could not intervene as a party in the proceeding because it would "contravene the requirement of the arbitration provision that she resolve her own disputes with [her employer] through arbitration." *Id.* at 151. The employee was not prevented from assisting the MCAD with its investigation or testifying in the hearing before the MCAD. *Id.*

We agree with the reasoning of the above-mentioned cases. The Court's rationale in *Waffle House* allows the ICRC to proceed with "its investigation and resolution" of Henry's claims against RAC, "including, if evidence warrants, granting relief specific to" Henry. *See id.* at 149. The agreement between the parties—Henry and RAC—"does not displace any independent authority" the ICRC has "to investigate and rectify violations" of the Act. *See Preston,* 552 U.S. at 359 n.7, 128 S. Ct. at 987 n.7, 169 L. Ed. 2d at 929 n.7. No one argues that the ICRC was a party to the Arbitration Agreement. "Accordingly, the proarbitration policy goals of the FAA do not require the agency to relinquish its statutory authority if it has not agreed to do so." *Waffle House,* 534 U.S. at 294, 122 S. Ct. at 764, 151 L. Ed. 2d at 769.

## IV. Conclusion.

The FAA does not mandate arbitration per se; it mandates that arbitration agreements be enforced. *See* 9 U.S.C. § 2. Thus, the FAA does not require arbitration of a proceeding brought by an entity that is not bound to arbitrate under generally applicable principles of contract law. For the reasons stated herein, we reverse the district court's judgment and remand the case to the district court with instructions to affirm the ICRC's order.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**